# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF NORTH CAROLINA
## CHARLOTTE DIVISION
## 3:10-cv-533-RJC

| | |
|---|---|
| GREGORY EUGENE NICHOLSON, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | |
| ) | **ORDER** |
| DENNIS MARSHALL; LAWRENCE ) | |
| PARSONS; SERGEANT FNU MILLS; ) | |
| and CORRECTIONAL OFFICER ) | |
| FNU WILLIAMS. ) | |
| ) | |
| Defendants. ) | |

**THIS MATTER** is before the Court on Defendants' Motion for Summary Judgment. (Doc. No. 23). For the reasons that follow, Defendants' Motion will be granted.

**I.  BACKGROUND**

Plaintiff is an inmate in the custody of the North Carolina Department of Public Safety. On April 27, 2010, Plaintiff was being transferred within the Lanesboro Correctional Institution from the maximum security Anson Unit to the Richmond Unit. Defendant Mills and Williams were responsible for transferring Plaintiff. Defendant Mills was employed as a Correctional Sergeant in the prison, and Williams was employed as a Correctional Officer. (Doc. Nos. 24-1: Mills Aff. at 1 ¶ 2; 24-2: Williams Aff. at 1 ¶ 2). Plaintiff's wrists were placed in handcuffs for the transfer and his arms were secured along his sides with hands behind his back. As they moved towards Richmond Unit, Defendant Mills ordered Plaintiff to stop in the middle of the hallway.  Plaintiff contends that the handcuffs were applied so tightly that indentations formed in his wrists. Plaintiff alleges that in response to the pain caused by the handcuffs, he moved away

1

from Mills who then ordered Plaintiff to pull the property from his former cell and continue toward his new cell. Plaintiff protested about the pain and stated that he could not proceed toward his cell and pull his property along with him because of the tightness of the handcuffs. According to the complaint, Williams then grabbed Plaintiff's arms and pushed them upwards from his waist until Plaintiff felt a sharp pain go through his arms. Plaintiff states that the sudden action by Williams caused him to "go into a standing fetal position" and the resulting pain inspired Plaintiff to seek medical attention. (Doc. No. 3-4).

The handcuffs were loosened for a moment and then Mills replaced them and Plaintiff complained that again the handcuffs were applied too tightly. According to Plaintiff, Mills, using a chain attached to the handcuffs, pulled Plaintiff into an upright position; this caused more pain and left more abrasions on Plaintiff's wrists and forearms. Plaintiff alleges that he felt the most pain in his left forearm and Plaintiff again complained about the pain the handcuffs were causing him. Plaintiff contends that Mills continued to pull him by the chain as they went for a medical examination.

Plaintiff's handcuffs were not removed during the examination. Stevens, a nurse in the prison, provided Plaintiff with an ice pack for his wrists and, according to Plaintiff, Stevens explained that was all of the treatment "they" would allow her to provide. (Id. at 4). Concluding that the examination was over, Plaintiff began to stand up at which point Williams ordered Plaintiff to stand up. Plaintiff replied that "he didn't need instructions" from Williams on how to stand up. According to Plaintiff, Williams jumped up from his seated position on the examination table and "grabbed plaintiff around the neck and slammed his head into a partition" and started choking Plaintiff. (Id. at 4-5). Plaintiff contends that as he tried to call for help, Williams placed his other hand around plaintiff's windpipe and slammed him into the nurse's

2

computer and resumed choking Plaintiff until he nearly lost consciousness." Plaintiff states that Williams, as he was choking him, shouted profanity at him and continued to tell him to stand up. (Id. at 4-5). Plaintiff alleges that Williams was pulled off of Plaintiff and he was escorted back to his cell. (Id. at 5). Along the way, Plaintiff maintains that Williams pulled on the chain attached to his handcuffs and caused abrasions to his arms. Eventually, Plaintiff was placed back in his cell. (Id. at 8).

The following day, Plaintiff states that he informed Assistant Unit Manager of the Richmond Unit, Defendant Dennis Marshall, of the alleged force used against him by Williams and Mills. (Id. at 5). Plaintiff described the incident and showed Marshall the injuries he says he sustained. Plaintiff requested that a copy of a camera recording of the incident be preserved for Plaintiff's defense in the case of a disciplinary proceeding. Plaintiff also states that he asked Marshall to discipline Williams and Mills for their conduct.

In response to Plaintiff's grievance, Plaintiff contends that Marshall did not make any reference to Plaintiff's allegations regarding excessive force by Williams and Mills, and Marshall did not address how such problems of excessive force would be treated in the future. (Id. at 6-7). On June 21, 2010, Defendant Parsons, an administrator in the prison, responded to Plaintiff's grievance. Parsons indicated that he had reviewed statements from Williams and Mills regarding the April 27th incident. These statements, according to Parsons, tended to show that Plaintiff refused to move during his scheduled transfer from the Anson Unit to the Richmond Unit. As a consequence, Williams had to escort him from his cell. After the medical examination, Parsons concludes in his report, Plaintiff positioned his head as though he were going to spit on Mills, and in response, Williams "gained control" of Plaintiff and escorted him back to his cell. Parsons recommended that no further action be taken. (Id. at 11: Step One –

Unit Response).

Plaintiff filed a complaint alleging excessive and unnecessary use of force. (Id. at 2). In his prayer for relief, Plaintiff seeks a declaration which states that the acts and omissions of the defendants violated his rights under federal law, and he seeks monetary damages, both nominal and punitive, against the defendants jointly and severally. (Id. at 10).

## II.     LEGAL STANDARD

### A.     Section 1983

Section 1983 provides a remedy where a person acting under color of state law deprives someone of a right secured by federal law. Section 1983 applies to violations of federal constitutional rights, as well as certain limited federal statutory rights. See Maine v. Thibotout, 448 U.S. 1 (1980); see also Gonzaga University v. Doe, 536 U.S. 273, 283 (2002) (holding that a right must be "unambiguously conferred" by a statute to support a Section 1983 claim); Golden State Transit Corp. v. Los Angeles, 493 U.S. 103, 107-08, n.4 (1989) ("A claim based on a statutory violation is enforceable under § 1983 only when the statute creates 'rights, privileges, or immunities' in the particular plaintiff ."). A pro se complaint in a proceeding in forma pauperis must be construed liberally. Haines v. Kerner, 404 U.S. 519, 520 (1972). However, the liberal construction requirement will not permit a district court to ignore a clear failure to allege facts in the complaint which set forth a claim that is cognizable under federal law. Weller v. Dep't of Soc. Servs., 901 F.3d 387 (4th Cir.1990).

### B.     Summary Judgment

Summary judgment is appropriate in cases where there is no genuine dispute as to a material fact and it appears that the moving party is entitled to judgment as a matter of law. United States v. Lee, 943 F.2d 366, 368 (4th Cir. 1991). Any permissible inferences which are

drawn from the underlying facts must be viewed in the light most favorable to the non-moving party. Matsushita Elec. Indus. Co. Ltd. v. Zenith Radio Corp. 475 U.S. 574, 587-88 (1986). However, when the record taken as a whole could not lead a trier of fact to find for the non-moving party, granting summary judgment is appropriate. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248-49 (1986). A factual dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Id. at 248. A material fact is one that has the possibility to impact the outcome of the lawsuit under the governing law. Id. at 247-48.

The movant has the "initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986) (internal citations omitted).

Once this initial burden of providing evidence is met, the burden then shifts to the nonmoving party. The nonmoving party "must set forth specific facts showing that there is a genuine issue for trial." Id. at 322 n.3. The nonmoving party may not rely upon mere allegations or denials of allegations in his pleadings to defeat a properly supported motion for summary judgment. Id. at 324. The nonmoving party must present sufficient evidence from which "a reasonable jury could return a verdict for the nonmoving party." Anderson, 477 U.S. at 248; accord Sylvia Dev. Corp. v. Calvert Cnty., Md., 48 F.3d 810, 818 (4th Cir. 1995).

## III. DISCUSSION

Plaintiff's complaint raises three issues which must be resolved in this Section 1983 action before Plaintiff can show that he is entitled to any relief: (1) did Williams and Mills employ excessive or unnecessary force when transferring Plaintiff from the Anson Unit to the

5

Richmond Unit; (2) did Williams employ excessive force in the medical treatment room, and on the way to Plaintiff's new cell; and (3) are Marshall and Parsons liable for failure to properly discipline and/or supervise Williams and Mills either prior to or following Plaintiff's report and participation in the grievance procedure that followed the events of April 27th.

Plaintiff alleges Williams and Mills utilized excessive force and this constituted cruel and unusual punishment in violation of his rights under the Eighth Amendment. Defendants Williams and Mills respond that their only efforts in handcuffing Plaintiff and subduing him in the examination room were done in an effort to control Plaintiff because he had become unruly and refused to respond to reasonable commands. (Doc. No. 24 at 4).

With regard to the transport from the Anson Unit to the Richmond Unit, and prior to the medical examination, Plaintiff alleges that he experienced pain because the handcuffs were placed too tightly around his wrists such that they left "indentations in the flesh of his wrist;" that he temporarily experienced numbness in his fingers; that he experienced temporary pain when Williams grabbed his arm and pushed them upwards; that Mills removed his handcuffs and when the handcuffs were replaced, they were again fitted too tightly around his wrists, causing him pain; that Mills attached a chain to his handcuffs and pulled on the chain thereby causing abrasions to Plaintiff's wrist and forearm area; and that his left arm was "severely damaged." (Doc. No. 1 at 3-4).

In regard to the allegations in the examination room, Plaintiff contends that Mills refused to remove his handcuffs during the examination; that after the nurse examined Plaintiff, Williams ordered Plaintiff to stand up, and Williams then grabbed Plaintiff around the neck and slammed his head into a partition and began choking Plaintiff; that Williams placed his other hand around Plaintiff's windpipe and that Plaintiff nearly lost consciousness. Defendants, in

6

their evidence in support of summary judgment, include affidavits from Mills, Williams, and a doctor under contract with the Department of Public Safety who reviewed Plaintiff's medical records, in particular, Plaintiff's medical records pertaining to the alleged incident of April 27, 2010. See (Doc. Nos. 24-1; 24-2; 24-3).

The parties do not differ in the following account of what occurred on April 27, 2010. Plaintiff was placed in handcuffs for transport from the Anson Unit to the Richmond Unit. The handcuffs caused Plaintiff's wrists to become sore and somewhat red. A chain was attached to the handcuffs, and Plaintiff's wrists were behind his back. After complaining of pain from the handcuffs, Plaintiff was transported for a medical examination by Stevens, a nurse employed by the prison. The following account is drawn from Stevens' notes following the examination. Plaintiff complained during the examination of swelling in his left hand and wrist. Redness was observed on Plaintiff's wrists. Stevens reported that Plaintiff complained that his hand was swollen, but Stevens could not confirm any swelling through visual inspection. Plaintiff was provided with an ice pack and something for his professed pain. (Doc. No. 24-3 at 20).

Where the accounts differ is on the details of the transfer. For instance, Williams avers that Plaintiff was ordered to stop walking and Plaintiff "became loud and belligerent and told Sergeant Mills and me that 'he was not going to finish pulling his buggy into C-pod.'"[1] Sergeant Mills informed Plaintiff that "he could finish pulling his buggy to C-pod. Inmate Nicholson refused to get his buggy and refused to continue walking. Sergeant Mills repeated her order to the inmate to start walking to C-pod. The Inmate refused and told Sergeant Mills" and Williams

---

[1] The parties do not dispute that Plaintiff was pulling the belongings, which were amassed from his former cell, in a "buggy" for transport to Richmond Unit. See, e.g., (Doc. Nos. 1 at 3; 24-2: Williams Aff. at 1-2 ¶ 5).

to take him back to the Anson Unit. (Doc. No. 24-2: Williams Aff. at 1-2 ¶ 6).

What transpires next, according to Williams' affidavit, is that, based on Plaintiff's refusal to resume his transfer to segregation in the Richmond Unit, Mills ordered Williams to put Plaintiff in a cell, "C-pod, cell 27." Williams placed his hand on Plaintiff's right arm and Plaintiff became loud and stated "you better get your hands off of me." (Id. at 2 ¶ 7). Plaintiff was then escorted to the Anson sick room. According to Williams, while awaiting his medical examination, Plaintiff "began cursing and threatening Sergeant Mills. [Plaintiff] told the Sergeant that, 'he was going to put a bullet in her head, slap her face, and spit in her white face because she was not anything but white trash.' [Plaintiff] then told [Williams that he] 'would pay too' and that '[Williams] was a punk nigger.'" (Id. at 2 ¶ 9).

After the medical examination concluded, Williams gave Plaintiff "a direct order to stand up as I gained control of Inmate Nicholson's handcuffs, he looked at me and told me to 'shut the fuck up.' He then looked at Sergeant Mills and positioned his mouth as if he were going to spit on her." (Id. at 2 ¶ 10). In his affidavit, Williams quotes from the prison standard operating procedures manual which provides that an officer may use hands-on physical force to restrain or move an aggressive inmate. See (Doc. No. 24-2 at 5-17: Operations Manual). Williams concludes by explaining that he secured Plaintiff's face against the wall in the examination room "to prevent him from spitting on Sergeant Mills and ordered the inmate to calm down and to stop resisting, cursing and threatening staff. I held Inmate Nicholson on the table in the sick room until he stopped resisting. I then escorted the inmate back to his cell." (Doc. No. 24-2: Williams Aff. at 3 ¶ 12).

In her affidavit, Defendant Mills avers that she noticed Plaintiff's handcuffs, were not on properly. I told the inmate to stop walking [so that she could] tighten

the handcuffs around Inmate Nicholson's wrist. Inmate Nicholson became loud and belligerent telling me he was not going to go into C pod. I ordered Inmate Nicholson to push his property and to go to C-pod. Again, the inmate refused to go into C-pod and said "take him back to [the] Anson Unit."

I then ordered Inmate Nicholson to keep walking to C pod with or without his property. The Inmate refused. After Inmate refused to follow my order for a third time, I told Officer Williams to escort the inmate into C pod to cell 27. Officer Williams placed his hands on the chain of the handcuffs and escorted Inmate Nicholson to his cell. The Officer in Charge and medical were notified.

Inmate Nicholson was taken to the sick call room of the Anson Unit. While Inmate Nicholson and I waited in the sick room for him to be examined by medical, I was in control of the handcuffs. Inmate Nicholson continued to curse and threaten me. He continued to make statements like, "you need to get your hands off of me you stupid white b-tch. I am not going to put up with a white b-tch putting their hands on me; I can promise you will pay for it, that's my word," Inmate Nicholson also stated that he "would put a bullet in my head, slap my face, and spit in my white face because I was nothing more than white trash." Inmate Nicholson continued to threaten Officer Williams and me the entire time he was being examined by medical. The inmate told Officer Williams that, "he would pay to, you ain't nothing but a punk n-gg-r."

After Inmate Nicholson had been treated by Nurse Stevens, Officer Williams ordered the inmate to stand up. As Officer Williams took control of the inmate's handcuffs by the chain, Inmate Nicholson looked at Officer Williams and told him to "Shut the fuck up."

Inmate Nicholson then looked at me and positioned his face as if he was going to spit in my face. Officer Williams secured Inmate Nicholson and placed his face against the wall in the sick room. The Inmate continued to curse, resist and threaten staff. . . . Officer Williams secured Inmate Nicholson on the table in the sick room until he stopped resisting. The Inmate was escorted to his cell.

At no time did I place the handcuffs on Inmate Nicholson so tight that "he almost passed out." Inmate Nicholson's wrist were red because control of the Inmate was taken by handcuff and the inmate continued to resist.

(Doc. No. 24-1: Mills Aff. at 2-3 ¶¶ 1-15).

After Defendants' evidence was filed with the Court, an Order was entered, pursuant to Roseboro v. Garrison, 528 F.2d 309 (4th Cir. 1975), notifying Plaintiff of his obligation in responding to Defendants' motion for summary judgment and supporting evidence. (Doc. No.

25). In his response, Plaintiff simply reiterates the allegations from his complaint. Plaintiff does not deny or even address the sworn statements from the affidavits of Williams and Mills. For instance, Plaintiff does not deny that he was being unruly and disruptive or that he expressed his refusal to transfer to Richmond Unit. In fact, Plaintiff, in his response, admits that he and "Defendant Mills were involved in a verbal exchange about her abuse as Plaintiff was being treated." (Doc. No. 26 at 2-3).

Nor does Plaintiff discuss evidence regarding his medical examination by Stevens, namely, the medical report that was completed following his examination on April 27th, and he does not dispute the contents of the medical report. In his affidavit, Dr. Stover avers that he has examined Plaintiff's prison medical records. From these records, Dr. Stover notes that Plaintiff was given a medical examination on April 27, 2010, following his complaints that one or more of the defendants used "excessive force and the improper placement of handcuffs." (Doc. No. 24-3: Stover Aff. at 1 ¶ 6). Dr. Stover testifies that Plaintiff "was examined by a medical professional the same day. The examining professional only found 'redness noted of the wrist.' No other significant abnormality and/or swelling was noted." (Id.). Dr. Stover's examination of the medical records notes no other entries in Plaintiff's medical history related to the April 27th incident: "Plaintiff did not file any sick call reports nor did he make any complaints about this incident to any other medical professional after April 27, 2010." (Id. at 2 ¶¶ 7-8).

When prison officers are accused of excessive force, the core inquiry is "whether the force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm." Hudson v. McMillan, 503 U.S. 1, 7 (1992). "When prison officials maliciously and sadistically use force to cause harm, contemporary standards of decency always are violated. Id. at 9 (citing Whitley v. Albers, 475 U.S. 312, 327 (1986)).

The evidence demonstrates that Plaintiff sustained some swelling and redness on one of his wrists. Defendants' evidence, through Mills' affidavit, tends to show that this redness and irritation was sustained as a result of Plaintiff's active resistance to following the officers' commands and his refusal to transfer to Richmond Unit. See (Doc. No. 24-1: Mills Aff. at 3 ¶ 15: "Inmate Nicholson's [wrists] were red because control of the Inmate was taken by handcuff and the inmate continued to resist."). Plaintiff does not dispute this statement.

Plaintiff was treated by nurse Stevens with an ice pack and released. The medical evidence offered by Defendants, which Plaintiff does not attempt to refute in his response, shows that Plaintiff received treatment on the day of the incident and received no further treatment for these alleged injuries. In his complaint and response, Plaintiff talks of no lingering injury, or pain into the next day, rather he clearly objects to being handcuffed and to the tightness of the handcuffs, and to being transferred from the Anson Unit to the Richmond Unit. Plaintiff also alleges that Williams placed him in a two-handed choke hold but Plaintiff makes no allegations concerning his request for treatment for this alleged action.

The affidavits of William and Mills portray the scene of an unruly prisoner who had determined that he would not be transferred from the Anson Unit to the Richmond Unit. Once his medical examination concluded, Williams and Mills were set to complete Plaintiff's transfer and the evidence makes plain that Plaintiff would take almost any measure to disrupt their efforts. Significantly, the evidence from the affidavits of the Defendants is uncontested by Plaintiff as it pertains to his threats to both Williams and Mills. This evidence shows that Williams and Mills were employing reasonable force to restrain a clearly disruptive and abusive prisoner. In short, the evidence shows that it was Plaintiff's resistance which caused Mills and

Williams to employ force in an effort to control Plaintiff.[2]

Prison officials are expected to use a reasonable amount of force to control an unruly prisoner and so long as this force is not carried out maliciously or for the wanton infliction of pain, Plaintiff cannot make out an actionable claim for excessive or unnecessary force. Based on the record before the Court, there is no evidence from which "a reasonable jury could return a verdict for" Plaintiff. Anderson, 477 U.S. at 248.

IV. **CONCLUSION**

**IT IS, THEREFORE, ORDERED** that Defendants' Motion for Summary Judgment is **GRANTED**. (Doc. No. 23).

Signed: September 19, 2012

Robert J. Conrad, Jr.
Chief United States District Judge

---

[2] The Court has concluded that Plaintiff has failed to present genuine issues of material fact such that a reasonable jury could find in his favor. It follows then that Plaintiff's claims against Defendants Marshall and Parsons for failing to discipline Mills and Williams must fail.